IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 15-00723 HG |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| BRYANT KAZUYOSHI IWAI, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
| _____ | ) |  |

**ORDER DENYING DEFENDANT BRYANT KAZUYOSHI IWAI'S MOTION TO
SUPPRESS EVIDENCE AND STATEMENTS
(ECF NO. 24)**

Defendant Bryant Kazuyoshi Iwai moves to suppress all evidence and statements the Government obtained from a controlled narcotics delivery operation that occurred on August 5, 2015.

The Court finds that (1) the law enforcement officers' entry into Defendant's apartment to prevent the imminent destruction of evidence was lawful; (2) The officers' seizure of the objects in plain view: a handgun, substances resembling methamphetamine, and drug paraphernalia, was lawful; (3) Defendant voluntarily consented to a search of his apartment; (4) Defendant waived his right to counsel by initiating conversation about his conduct with the officers during his transit to the Honolulu Bureau of Alcohol, Tobacco, and Firearms Office; (5) Defendant confessed voluntarily; and (6) Defendant consented voluntarily to a search

1

of his cellular telephone.

Defendant Iwai's Motion to Suppress Evidence and Statements (ECF No. 24) is **DENIED**.

## PROCEDURAL HISTORY

Defendant Bryant Kazuyoshi Iwai ("Defendant" or "Defendant Iwai") is charged in the Indictment filed on September 17, 2015 (ECF No. 18) as follows:

**Count 1**– conspiracy to distribute and possess with intent to distribute approximately 9,479.3 grams of methamphetamine, its salts, isomers, and salts of isomers, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

**Count 2**– attempt to possess, with intent to distribute approximately 2,778.6 grams of methamphetamine, its salts, isomers, and salts of isomers, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

**Count 3**– possession with intent to distribute approximately 6,700.7 grams of methamphetamine, its salts, isomers, and salts of isomers, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

**Count 4**– possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(2).

In addition to the four enumerated counts, the Indictment

contained a forfeiture allegation for $32,240 in United States currency, a Smith & Wesson .38 caliber revolver, and five rounds of W-W brand .38 caliber ammunition, all of which were seized from Defendant's apartment at 98-288 Kaonohi Street, Unit 2303, Aiea, Hawaii.

On October 13, 2015, Defendant filed DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS ("Defendant's Motion"). (ECF No. 24).

On October 27, 2015, the United States filed its Opposition to Defendant's Motion.  (ECF No. 28).

On January 6, 7, and 12, 2016, the Court held hearings on Defendant's Motion.  (ECF Nos. 38; 39; 41).

On January 12, 2016, the Court ordered Defendant to undergo a mental competency evaluation.  (ECF No. 41).

On April 8, 2016, a report from a psychiatrist regarding Defendant's mental competency was filed under seal.  (ECF No. 70).

At the hearing on April 12, 2016, the Court found Defendant competent to stand trial.  The Court then held the final hearing on the Defendant's Motion.  (ECF No. 72).

## <u>ANALYSIS</u>

Defendant Bryant Kazuyoshi Iwai ("Defendant" or "Defendant Iwai") moves to suppress all evidence and statements the Government obtained from a controlled narcotics delivery

3

operation that occurred on August 5, 2015.

Honolulu Police Officers Joshua Correa ("Officer Correa"), Kyle Echiberi ("Officer Echiberi"), Brian Whipple ("Officer Whipple"), Persian Lardizibal ("Officer Lardizibal"), Jennifer Bugarin ("Officer Bugarin"), and Matthew Liana ("Officer Liana") testified at the hearings on Defendant Iwai's Motion to Suppress.[1]

United States Postal Inspector Jensen Rodrigues ("Postal Inspector Rodrigues") and Drug Enforcement Agency ("DEA") Special Agent Richard Jones ("Agent Jones") also testified at the hearings on Defendant Iwai's Motion.

Defendant did not put forward any evidence controverting the witnesses' testimony. The Court finds the witnesses' testimony credible.

## I. EVIDENCE SEIZED FROM DEFENDANT IWAI'S APARTMENT

### A. The Officers' Entry into Defendant's Apartment

The Fourth Amendment of the United States Constitution generally requires law enforcement officers to obtain a warrant before entering a home uninvited. United States v. Stafford, 416 F.3d 1068, 1073 (9th Cir. 2005). Warrantless entries are permitted only under limited exigent circumstances. Kentucky v. King, 131 S. Ct. 1849, 1856 (2011) (identifying various

---

[1] The Honolulu Police officers were also cross-designated as Drug Enforcement Agency Task Force Officers.

situations that permit warrantless searches).  A recognized
exigent circumstance arises when law enforcement officers enter a
residence to prevent the imminent destruction of evidence.  King,
131 S. Ct. at 1856; Dixon v. Wallowa Cnty., 336 F.3d 1013, 1018
(9th Cir. 2003).

The Government has the burden of demonstrating the
reasonableness of a warrantless entry.  United States v.
Carbajal, 956 F.2d 924, 930 (9th Cir. 1992).  A warrantless entry
conducted to prevent the imminent destruction of evidence may be
constitutional if supported by probable cause.  United States v.
Alaimalo, 313 F.3d 1188, 1193 (9th Cir. 2002).  Probable cause
exists where, under the totality of circumstances, there is a
fair probability or substantial chance that the evidence faces
imminent destruction.  United States v. Brooks, 367 F.3d 1128,
1134 (9th Cir. 2004); Dixon, 336 F.3d at 1018.

**Defendant was Suspected of Drug Distribution**

On August 4, 2015, the United States Postal Inspection
Service intercepted a package en route from Las Vegas, Nevada, to
Defendant Iwai's residence at 98-288 Kaonohi Street, Apartment
2303, Aiea, Hawaii.  (Motion to Suppress Hearing Exs. 11; 12).  A
search warrant was obtained, and the package was opened in the
presence of Officers Bugarin and Echiberi.  The package contained
approximately six pounds of methamphetamine.  Officer Bugarin
testified that a typical drug parcel contains between one and two

5

pounds of methamphetamine.

As a result of discovering the large quantity of methamphetamine in the package, the United States Postal Inspection Service and DEA planned a controlled delivery of the package to the destination address, Defendant's apartment.

**Installation of a GPS Tracking Device and Beeper**

In the morning of August 5, 2015, Officer Correa obtained a warrant to place a GPS tracker and beeper inside the package. (Hearing Exs. 9; 10).

A beeper is a credit card-sized device that is designed to alert law enforcement when a parcel is opened.  The beeper is triggered when one of its hair-thin wires, which are attached to all sides of the box, is severed.  In most cases, the beeper alerts because the parcel has been opened.  On rare occasion, however, some force striking the parcel or the dropping of the parcel may sever the delicate wire and trigger the beeper's signal.

Officer Bugarin tested the beeper and installed it inside the package.  She then resealed the package and tested the beeper again.  The beeper passed both tests.

Defendant does not challenge the validity of the Government's interception and search of the package, nor does he dispute the legality of the Government's installation of a GPS tracker and beeper in the package.

**The Officers Could Not Obtain an Anticipatory Search Warrant for Defendant's Apartment**

In preparation for the controlled delivery, Officers Correa and Echiberi surveilled Defendant's apartment building and learned that the postal service does not deliver parcels to individual apartment units.  Residents pick up packages from either a communal mailbox or the building manager's office.

The officers chose to deliver the package to the manager's office, so as to prevent the arousal of Defendant's suspicion. The typical delivery procedure, however, precluded the officers from obtaining an anticipatory search warrant for Defendant's apartment.  The officers had no ability to know where the package would be taken or opened.  See United States v. Grubbs, 547 U.S. 90, 94 (2006) (holding that an anticipatory warrant is "based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place") (internal quotations and citation omitted).

**The Controlled Delivery**

At approximately 11:48am, a group of law enforcement officers comprised of DEA agents, DEA task force officers, and Postal Inspector Rodrigues, initiated the controlled delivery operation.  Officer Bugarin was the lead case agent and the only female law enforcement officer involved with the operation.  The officers positioned themselves around the apartment building's perimeter, inside the building manager's office, and in

7

stairwells near Defendant Iwai's apartment.

At around noon, Postal Inspector Rodrigues posed as a mail carrier and used the apartment building's callbox to contact apartment 2303.  A male answered the call, and Postal Inspector Rodrigues informed him that a package would be left with the building manager.

At approximately 12:50pm, Officers Correa and Echiberi, who were positioned as undercover officers in the building manager's office, observed Defendant Iwai pick up the package and head toward the building's elevators.  Defendant entered an elevator with the package and proceeded to the 23rd floor.  Officer Echiberi observed Defendant through a video monitor that displayed a live feed from the elevator's security camera.  Officer Echiberi updated the other law enforcement units of Defendant's movements.  Defendant Iwai pushed the package out of the elevator with his feet.  He then entered apartment 2303 with the package.  The officers held their respective positions and awaited the beeper's signal.

**The Officers' Entry into Defendant's Apartment**

At approximately 3:15pm, the beeper signaled that the package had been opened inside Defendant's apartment.  Agent Jones led an entry team of around a half-dozen officers to Defendant's apartment.

Agent Jones knocked on the apartment's front door and

8

identified himself as police at a volume loud enough to cause a neighboring unit's residents to open their door.  Agent Jones did not hear a response, but saw, through the front door's peephole, the figure of a person stand up and walk towards the front door. Agent Jones responded by continuing to knock and ask that the door be opened.  The person in the apartment stepped away from the door and left Agent Jones' view.  Agent Jones testified that he then heard what sounded like "somebody going through a garbage can[,] like a rustling of papers or plastic."  He concluded that evidence in the apartment was in danger of being destroyed, and ordered the team to enter the unit.

The officers breached the front door and entered the apartment.  They immediately saw Defendant Iwai near the kitchen area.  He was the only occupant of the unit.  The officers also saw the package.  It was unopened.

### 1. The Officers Entered Defendant's Apartment Under Exigent Circumstances to Prevent the Imminent Destruction of Evidence

The totality of the circumstances establishes that the officers had probable cause to believe that evidence faced the threat of imminent destruction, and that they entered Defendant Iwai's apartment to prevent such an event from occurring.  See United States v. McCabe, 582 F. App'x 680, 682 (9th Cir. 2014) (stating that "exigencies must be viewed from the totality of circumstances known to the officers at the time of the

warrantless intrusion") (quoting United States v. Licata, 761 F.2d 537, 543 (9th Cir. 1985)).

The events culminating in the entry into Defendant's apartment demonstrate that the officers' actions comport with the Fourth Amendment.  Defendant, and his apartment, were under investigation as part of a drug trafficking interdiction.  The United States Postal Inspection Service had intercepted a package addressed to Defendant and found it carried six pounds of methamphetamine.  Agent Jones, a highly experienced narcotics investigator, knew that Defendant picked up the package from the building manager's office and brought it into his apartment.  See United States v. Hicks, 752 F.2d 379, 383-84 (9th Cir. 1985) (overruled on other grounds) ("In assessing the existence of probable cause to enter or to search a residence, this court has held that direct observation of contraband in a particular location is not required. A court may also consider 'the type of crime, nature of the items, and normal inferences where a criminal will likely hide contraband.'") (quoting United States v. Dubrofsky, 581 F.2d 208, 213 (9th Cir. 1978)).  Despite identifying himself as a law enforcement officer and repeatedly asking the door be opened, Agent Jones saw the figure of a person stand up, walk towards the front door, and then retreat to the interior of the apartment.  See Dualeh v. United States, 466 F. App'x 621, 622 (9th Cir. 2012) (holding that a person watching

10

police officers from the second floor of a home they were about
to enter to serve drug-related warrants supported a finding that
exigent circumstances to prevent the destruction of evidence
existed).   The significance of the figure's suspicious behavior
was compounded by the rustling noises Agent Jones heard
immediately after seeing the then-unidentified figure back away
from the door.   The circumstances of these events "would cause a
reasonable person to believe that entry . . . was necessary to
prevent . . . the destruction of relevant evidence."   Brooks, 367
F.3d at 1135 (internal quotations and citations omitted); United
States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988) (officers
were permitted to enter after seeing someone look through the
front door's peephole and retreat, and hearing a "scrambling"
noise); United States v. Ashbourne, 571 F. App'x 422, 424-25 (6th
Cir. 2014) (allowing warrantless entry in a situation where
officers heard unexplained noises from inside an apartment and
received no response after shouting at the resident to come to
the door).

### 2. The Beeper's Errant Signal did not Render the Officers' Entry Illegal

Defendant places great weight on the beeper's apparent false
alert.   The fact that the beeper's signal precipitated a chain of
events that led to a forced entry into the apartment is not
dispositive.   The officers approached the door because the beeper

signal indicated to them the package had been opened.  The exigent circumstances in this case arose when the officers heard what sounded like the rustling of paper and plastic.  See United States v. Banks, 540 U.S. 31, 38 (2003) (recognizing that the destruction of drugs can occur in less than 20 seconds).  Once they heard the rustling noises, "the exigency had matured, [and] the officers were not bound to learn anything more or wait any longer before going in."  Id. at 40.

The officers relied on the efficacy of the beeper in good faith.  The beeper passed both of Officer Bugarin's pre- and post-installation tests.  There is no evidence that the beeper routinely malfunctioned, or was unreliable.  Testimony introduced at the hearings indicated that while the beeper's wires were delicate, false signals occurred on rare occasion.  In this case, the Defendant had been observed kicking the parcel prior to taking it into his apartment.

The totality of circumstances resulted in an appearance that the package and its contents were in imminent danger of destruction.  Brooks, 367 F.3d at 1134.  The law enforcement officers' warrantless entry into Defendant's apartment complies with the Fourth Amendment.

**B. The Officers' Seizure of Items in Plain View**

In limited situations, the Fourth Amendment permits the government to seize, without a warrant, evidence laying in plain view.  Horton v. California, 496 U.S. 128, 133-35 (1990).  For the plain view exception to apply, (1) "the officers must be lawfully searching the area where the evidence is found"; and (2) "the incriminatory nature of the evidence must be immediately apparent."  Stafford, 416 F.3d at 1076 (internal quotations and citations omitted).

**The Officers' Discovery of Drugs, Drug Paraphernalia, and a Firearm in Defendant's Apartment**

After the officers breached defendant's front door, they entered the apartment and conducted a security sweep.  The officers saw a handgun in plain view on the living room table. They observed six clear plastic bags containing a white powdery substance resembling methamphetamine on the kitchen stove and on a table in the left-side of the apartment.  (See Ex. A of Def. Motion at ¶ 27, ECF No. 24).  The officers also observed drug paraphernalia commonly used to smoke methamphetamine in the apartment.

### 1. The Officers were Lawfully Present in the Apartment

Law enforcement officers are lawfully present in a particular area if they either act in accordance with a valid warrant or satisfy one of the Fourth Amendment's recognized exceptions.  Soldal v. Cook Cnty., Ill., 506 U.S. 56, 66 (1992).

The Court finds that the officers conducted a valid entry into Defendant's apartment to prevent the imminent destruction of relevant evidence.  The officers' presence in Defendant's apartment was lawful.  See Dixon, 336 F.3d at 1018.

### 2. The Incriminating Nature of the Seized Evidence was Immediately Apparent

An item's incriminating character is determined in the context of surrounding circumstances.  United States v. Brinkerhoff, 404 Fed. Appx. 147, 149 (9th Cir. 2010).  The incriminating nature of an item is immediately apparent if there is probable cause to believe that the item is illegal or associated with criminal activity.  Stafford, 416 F.3d at 1076.  Probable cause exists "when the available facts would warrant a reasonably cautious person's belief that the items in plain view are useful as evidence of a crime."  United States v. Miller, 769 F.2d 554, 557 (9th Cir. 1985).

The handgun, bags containing a substance resembling methamphetamine, and drug paraphernalia were immediately suspected to be incriminating evidence.  When the law enforcement officers entered Defendant's apartment, it was in the context of a drug trafficking interdiction.  The presence of a white powdery substance provided probable cause to believe that the bags could contain drugs.  Id.  The drug paraphernalia also provided probable cause to believe it could be associated with the drug

14

trade.  United States v. Hudson, 100 F.3d 1409, 1420 (9th Cir. 1996).  Similarly, a handgun found during a drug raid's incriminating nature is immediately apparent.  The possession of a firearm in furtherance of a drug trafficking crime is *per se* illegal.  United States v. Armstrong, 554 F.3d 1159, 1163 (8th Cir. 2009) (citing 18 U.S.C. § 924(c)(1)(A)); see also United States v. Kia, 170 F. App'x 457, 461 (9th Cir. 2006).

The law enforcement officers' seizure of the handgun, bags containing a substance resembling methamphetamine, and drug paraphernalia was permissible under the plain view exception.

**C. Evidence Seized Pursuant to a Consent Search**

A valid consent to search eliminates the need to obtain a warrant or show that police conduct conformed to a recognized warrant exception.  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  An individual's consent to search his residence is valid if it is voluntary.  United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990).  The Government bears the burden of proving by a preponderance of the evidence that consent was voluntary.  Carbajal, 956 F.2d at 930.

Determining the voluntariness of a consent requires an examination of the totality of circumstances.  Kaplan, 895 F.2d at 622.  No single criterion is dispositive.  Id.

15

The Ninth Circuit Court of Appeals has identified five factors that indicate whether an individual voluntarily consented to a search:

> (1) Whether the defendant was in custody;

> (2) Whether the arresting officers had their guns drawn or otherwise overmastered the suspect;

> (3) Whether <u>Miranda</u> warnings were given prior to the search;

> (4) Whether the defendant was told he had a right to withhold his consent; and

> (5) Whether the officers claimed that they could obtain a search warrant.

<u>United States v. Patayan Soriano</u>, 361 F.3d 494, 502 (9th Cir. 2004).

The five factors serve as a guidepost, not as a mechanical checklist. A court may review other relevant facts in its examination of whether the defendant's consent was voluntary. <u>Id.</u> at 502-05 (reviewing the customary five factors while also considering whether police officers impermissibly threatened the defendant).

**Defendant's Interactions with the Officers in his Apartment**

As Agent Jones and his team entered the apartment, they saw Defendant come out of the kitchen. Defendant was then handcuffed and seated on the living room floor.

At the January 6, 2016 Motion to Suppress Hearing, Drug Enforcement Agency Special Agent Richard Jones' Testified as follows:

Q     All right.  After the apartment was deemed safe, did you have any direct contact with Mr. Iwai at that point?

A     Yes, sir

Q     What was the purpose of that contact?

A     I wanted to explain to Mr. Iwai what was going on, and I wanted to get his cooperation.

Q     Was Mr. Iwai handcuffed at that point?

A     Yes, sir.

Q     This occurred in what part of the apartment?

A     He was still sitting in the same position.  He was seated on the floor in the same spot where we had detained him.

Q     And you were still in your raid gear, tactical gear, I assume?

A     Yes, sir; but however, I put the shield away.

Q     I guess in summary, what did you tell Mr. Iwai as to what was happening or what was going on at that point?

A     I advised him that we did not have a search warrant for his apartment, and that he wanted – that I wanted him to be able to coorperate with us so that we can get the

guys that were on the mainland, and he agreed to
coorperate with us.

Q    Okay. Did you seek any specific type of cooperation at
that time, other than the general notion of
cooperation?

A    Well, I told him as the part of the cooperation thing
that we needed to get all the drugs out of the
apartment there were already there, and so I needed his
consent to be able to search the apartment.  He'd also
asked me what he wanted me to do – or what he would
have to do for cooperation.

Q    So you made clear that you were seeking his consent to
search the apartment?

A    Yes, sir.

Q    Did Mr. Iwai indicate to you that he was okay with
that?

A    Yes, sir.

Q    Was this done in writing or verbally?

A    That was done verbally.  And then once he advised that
he would consent to the apartment, I asked TFO Burgarin
to get the consent to search form.


Agent Jones testified that he did not seek to interrogate
Defendant as to the circumstances of his arrest; he was merely

18

looking to obtain Defendant's consent to search the apartment.
See Knope, 655 F.3d at 654 (recognizing that "a consent to search
is not an interrogation within the meaning of Miranda") (internal
quotations and citations omitted).

**Defendant Iwai Signs a Consent-to-Search Form**

A few minutes after Defendant verbally agreed to a search of
his apartment, Officer Jennifer Bugarin arrived with a consent-
to-search form.

Officer Bugarin met with Defendant Iwai and Officer
Lardizibal in an area between the living room and bedroom.  Both
officers were visibly armed and were wearing their tactical gear
with police markings.  Officer Lardizibal removed Defendant's
handcuffs, and Officer Bugarin explained the contents of the
consent form to Defendant.  Officer Bugarin also wrote the
apartment address on the form.

At 3:25pm, Defendant Iwai initialed and signed the consent
form inside his apartment, unit 2303.  (Hearing Ex. 1).  Officer
Bugarin had mistakenly written 2302 instead of 2303.  The
Defendent did not notice the error.

**Additional Evidence is Found as a Result of the Consent Search**

After receiving Defendant's signed consent form, law
enforcement officers searched the apartment and found
approximately 14 pounds of crystal methamphetamine, more than

$32,000 in United States currency, a digital scale, a ledger, and plastic bags.  (Ex. A of Def. Motion at ¶¶ 27-28, ECF No. 24).

### (1) Custody

A person is considered to be in custody when his freedom to move is curtailed in a similar degree to that of a formal arrest. Berkemer v. McCarty, 468 U.S. 420, 440 (1984).  To determine whether a person was in custody, courts look to the totality of circumstances and ask whether a reasonable person in the same situation would have felt at liberty to terminate any interrogation and leave.  United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008).

The totality of circumstances establishes that Defendant was in custody when he permitted the officers to search his apartment.  Defendant was surrounded by multiple officers.  The officers had handcuffed Defendant soon after they entered the apartment, and Defendant was seated on the living room floor when Agent Jones asked him to consent to a search.  It was clear that Defendant was not free to leave.

### (2) No Weapons Drawn

The officers who were in the apartment at the time, including Agent Jones and Officer Bugarin, did not have their firearms drawn.

### (3) **Miranda** Warning

Defendant was not apprised of his <u>Miranda</u> rights before Agent Jones asked him to consent to a search of the apartment. The lack of a lack of a <u>Miranda</u> warning, however, does not preclude a finding of voluntariness. <u>Knope</u>, 655 F.3d at 654; <u>United States v. Lara</u>, 932 F.2d 973 (9th Cir. 1991) (unpublished op.). The Ninth Circuit Court of Appeals has questioned "the relevance of <u>Miranda</u> warnings to whether a consent to search was voluntary[,]" and suggested that such an inquiry provides no insight into the voluntariness of a consent. <u>United States v. Perez-Lopez</u>, 348 F.3d 839, 846-47 (9th Cir. 2003). The Supreme Court has also indicated that the failure to provide <u>Miranda</u> warnings has no effect on the voluntariness of an individual's consent. <u>See</u> <u>generally</u> <u>United States v. Patane</u>, 542 U.S. 630 (2004). The failure to provide a <u>Miranda</u> warning, however, remains as one factor to consider pursuant to binding law in the Ninth Circuit. <u>United States v. Basher</u>, 629 F.3d 1161, 1168 (9th Cir. 2011) (applying the <u>Miranda</u> warning factor); <u>United States v. Poom-Medina</u>, 606 F. App'x 354, 355 (9th Cir. 2015)(same).

### (4) Right of Refusal

There is no evidence as to whether Defendant was told he had a right to withhold or retract his consent. Defendant was very cooperative and calm throughout his interactions with the officers. He did not hesitate in providing his consent.

### (5) Threat of a Search Warrant

21

There is no evidence indicating that the officers told Defendant that they could obtain a search warrant if he did not consent to a search.  The officers did not offer any promises to Defendant in exchange for his consent, nor did they threaten him or force him to sign the consent form.

Two of the five factors (no weapons drawn; no threats) favor a finding of voluntary consent.  One factor (custody) favors a finding of involuntary consent.  The remaining two factors (lack of Miranda warning; and right to refuse consent) yield a neutral result, and do not favor either conclusion.  United States v. Vongxay, 594 F.3d 1111, 1120 n. 6 (9th Cir. 2010) ("An officer is not *required* to inform the person being searched that he has a right to refuse consent; doing so simply weighs in favor of finding consent") (emphasis in original); Perez-Lopez, 348 F.3d at 846.  Since the five-factor inquiry is not dispositive, the Court considers other relevant facts regarding Defendant's consent to determine its voluntariness.  Patayan Soriano, 361 F.3d at 502 ("It is not necessary to check off all five factors, but many of this court's decisions upholding consent as voluntary are supported by at least several of the factors. . . . Nevertheless, these factors are only guideposts, not a mechanized formula to resolve the voluntariness inquiry") (internal quotations and citations omitted).

### a. Other Relevant Facts Support a Finding of Voluntary Consent

Defendant's physical and mental condition at the time of his consent appeared normal.  Testimony introduced at the hearings demonstrated that Defendant was not intoxicated, fatigued, or under the influence of drugs.  He was coherent and did not indicate any hesitation or misunderstanding.

The officers' treatment of Defendant Iwai was similarly ordinary.  Defendant was not handcuffed when he signed the consent form.  There is no evidence that any law enforcement officer threatened or otherwise coerced him into agreeing to a search.  Officer Bugarin carefully explained the contents of the form to Defendant.  In addition, the Ninth Circuit Court of Appeals has held that the existence of a signed consent form is an indication of voluntary consent.  United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988) ("Execution of a consent form is one factor that indicates that consent was voluntary").

The Court finds Defendant's consent to search his apartment was voluntary under the totality of the circumstances.

### b.  The Consent Form is Sufficiently Accurate

Defendant now argues that his consent is invalid, as the consent form he signed had an error in the apartment number.

23

When the officers and Defendant discussed the search of his apartment, they were in unit 2303, where Defendant signed the consent form. At no point was apartment 2302 involved in the investigation. See United States v. Knope, 655 F.3d 647, 654 (7th Cir. 2011).

A consent form, like a search warrant, is valid if it sufficiently describes the place to be searched. See United States v. Mann, 389 F.3d 869, 876-77 (9th Cir. 2004) (upholding the validity of a search warrant that named an incorrect address). Suppression is not appropriate because the consent form must be "interpreted in a common sense and realistic, rather than a hypertechnical, manner." United States v. Turner, 770 F.2d 1508, 1511 (9th Cir. 1985). The error of one digit did not override the fact that Defendant knew that he was consenting to search of his own apartment.

## II. DEFENDANT'S STATEMENTS TO LAW ENFORCEMENT OFFICERS

### A. Defendant's Statements During his Transit to the Honolulu ATF Office

Law enforcement may not use a suspect's statements that were elicited from custodial interrogation unless they inform him of the right to remain silent and of his right to the presence of an attorney. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Once a suspect subjected to custodial interrogation requests the presence of counsel, any government interrogation of that person

24

must cease until (1) an attorney is present or (2) the suspect
reinitiates conversation with the officers and waives his right
to counsel.  Davis v. United States, 512 U.S. 452, 458 (1994)
(citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).

**Defendant's Arrest**

After Defendant signed the consent-to-search form in the
apartment, Officers Echiberi and Bugarin brought him to the
bedroom.  Officer Echiberi informed Defendant that he was under
arrest for possession of methamphetamine.  Officer Bugarin
testified that she took out her police credentials and badge,
identified herself as a police officer, and read a card that had
a Miranda warning to Defendant.  She stated:

> Before we ask you any questions, you must understand you
> have the right to remain silent, anything you say can be
> used against you in court.  You have the right to talk to
> a lawyer for advice before we ask you any questions and
> to have a lawyer with you during questioning.  If you
> cannot afford a lawyer one will be appointed for you
> before any questioning if you wish.  Do you understand?

Officer Bugarin testified that Defendant Iwai answered,
"yes."  Officer Bugarin responded by asking him if he was willing
to answer some questions.  Defendant Iwai then stated he wanted a
lawyer.  Officers Echiberi and Bugarin immediately ceased any
questioning and prepared Defendant for transport to the Honolulu
Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
Office to be processed for booking.

**Defendant's Transit to the ATF Office**

25

Officers Bugarin and Liana escorted Defendant Iwai, who was in handcuffs, to a police car.  Defendant was placed in the front passenger seat, Officer Bugarin got into the driver's seat, and Officer Liana sat in the rear passenger seat behind Defendant.

During the 15-20 minute transit to the ATF Office, Defendant Iwai began speaking to Officers Bugarin and Liana.

At the January 6, 2016 Motion to Suppress Hearing Police Officer Jennifer Bugarin testified as follows:

Q   En route to the airport task force office from the
    Pearl Ridge Square, was there any conversation between
    you or Officer Liana and Mr. Iwai?

A   There was some talking, but we never discussed the
    case.  It was more of a personal nature on Mr. Iwai's
    side.

Q   So who initiated this conversation?

A   Mr. Iwai.

Q   Okay.  We don't need to know the details, but what
    sorts of things were discussed?

A   I know he was really thankful about his dog because we
    – I guess this lady that was working with us, she's an
    agent, she helped him like put the dog somewhere safe
    because he didn't want to leave the dog at home.  And
    then he spoke about his girlfriend that was supposed to

be coming because he was really worried about her.  I
guess she was supposed to come from Vegas that night
that he arrested him.  And then he started saying, "You
know what, I just want to cooperate.  What do you guys
have for me?  Like what kind of questions?  I just want
to help."

Q    How did you respond, if at all, to that question?

A    At that point, I just said, "Okay, well when we go back
to the office we'll talk about it, and I'll read you
your rights again."

Q    Okay.  So was there any questioning of Mr. Iwai in
anything at all with regard to do with the
investigation during the transport?

A    No.

Q    Once you got to the office, where was Mr. Iwai taken?

A    He was taken to the interview room at our office at the
airport.


Neither officer questioned Defendant about the case during
the transit to the ATF Office.  Officer Liana testified that
Defendant Iwai was talkative throughout the transit.

### 1. Defendant Reinitiated Conversation with the Officers

Defendant's unsolicited statements during the drive to the
ATF Office demonstrated his willingness and "desire to open up a

more generalized discussion relating . . . to the investigation." Mickey v. Ayers, 606 F.3d 1223, 1235 (9th Cir. 2010) (internal quotations omitted) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983)). His statement, "you know what, I just want to cooperate," fits within the type of comments the appellate and district courts in the Ninth Circuit have found to qualify as reinitiations. See, e.g., United States v. Floyd, 77 F.3d 491 (9th Cir. 1996) (unpublished); United States v. Camacho, 930 F.2d 29 (9th Cir. 1991) (unpublished); United States v. Mason, 993 F.Supp.2d 1308, 1313-14 (D. Or. 2014).

### 2. Defendant's Unsolicited Offer to Cooperate was a Voluntary, Knowing, and Intelligent Waiver of his Miranda Rights

A suspect's waiver of his right to an attorney is valid if made voluntarily, knowingly, and intelligently. Edwards, 451 U.S. at 482. There is no requirement that a waiver be express; a suspect's words or conduct may provide a valid implied Miranda waiver. Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).

In determining whether an accused person has made a valid waiver, courts review the totality of the circumstances surrounding the waiver, including the background, experience, and conduct of the suspect. United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir.) amended, 416 F.3d 939 (9th Cir. 2005). The government has the burden of showing, by a preponderance of

28

evidence, that Defendant Iwai waived his <u>Miranda</u> rights.
<u>Berghuis</u>, 560 U.S. at 383-84.


### a. Voluntary

Under the totality of circumstances analysis, a waiver is
voluntary if the statement "was the product of a free and
deliberate choice rather than coercion or improper inducement."
<u>Rodriguez-Preciado</u>, 399 F.3d at 1128 (internal quotations and
citation omitted).  The focus of a voluntariness assessment is on
police behavior.  <u>United States v. Younger</u>, 398 F.3d 1179, 1185
(9th Cir. 2005).

During the car ride to the ATF Office, Defendant
spontaneously spoke to Officers Bugarin and Liana.  The officers
did not interrogate him at any point during the transit, nor did
they substantively followup on his offer to cooperate.  The
testimony introduced at the suppression hearings established that
Defendant's offer to cooperate was of his own free will.  There
is no evidence of any coercive behavior on the part of the
officers.  Defendant's waiver of <u>Miranda</u> was voluntary.  <u>Younger</u>,
398 F.3d at 1185.


### b.  Knowing & Intelligent

A waiver is knowing and intelligent if "it is made with a

full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Rodriguez-Preciado, 399 F.3d at 1127 (internal quotations and citations omitted).

Officer Bugarin testified that she informed Defendant of his Miranda rights, including his right to counsel, and warned him that anything he said could be used against him.  Defendant began speaking to Officers Bugarin and Liana while being transported.  He informed the officers that he was willing to talk about his role in the case.  In the period of time after he was first advised of his Miranda rights and transported to the ATF Office, Defendant changed his mind and offered to cooperate with the officers.

The totality of the circumstances surrounding Defendant's offer of cooperation establishes that Defendant Iwai reinitiated conversation with Officers Bugarin and Liana, and that he voluntarily, knowingly, and intelligently waived his Miranda rights.

**B.  Defendant's Confession at the ATF Office**

A confession is valid if made voluntarily.  United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).  The voluntariness analysis is designed to exclude statements obtained by physical

or psychological coercion, or by any other improper inducement
that causes a suspect's will to become overborne.  United States
v. Harrison, 34 F.3d 886, 890 (9th Cir. 1994).

**Defendant Iwai's Arrival at the ATF Office**

Upon arrival at the ATF Office, Defendant Iwai was taken to
an interview room.  The interview room was small, square-shaped,
and had three chairs and a table.  Defendant sat in a chair.
Officer Bugarin took off his handcuffs, gave him some water, told
him that she would return, and left the room.

**Defendant's Consent to Search his Cellular Telephone**

Agent Jones and Officer Correa briefly entered the interview
room.  The officers asked Defendant to consent to a search of his
cellular telephone.  Officer Correa provided a consent form to
Defendant and explained it to him.  Defendant Iwai indicated that
he understood Officer Correa, and signed it. (Hearing Ex. 3).
The officers did not question Defendant about the case.
Defendant did not have trouble communicating with Officer Correa,
nor did he appear intoxicated or fatigued.

**Officer Bugarin Informed Defendant of his Miranda Rights for a
Second Time**

Approximately 15 minutes after Officer Bugarin left, she and
Officer Echiberi entered the interview room.  The two officers
were in plainclothes and were not visibly armed.  They sat across
from Defendant Iwai.

31

Officer Bugarin presented Defendant with an "Advice of Rights" form.  (Hearing Ex. 2).  She told Defendant that the form had the same line of questioning that she previously presented to him in the apartment.  Officer Bugarin read each line to Defendant and told him to initial each sentence that he understood.

**Defendant Signed a Waiver of Rights Form**

At 4:30pm, Defendant signed and initialed the "Advice of Rights" form.  He wrote "yes" next to the questions asking, "Do you understand your rights?" and "Are you willing to answer some questions?" (Hearing Ex. 2).  Defendant Iwai did not ask for an attorney.  He did not appear fatigued.  Officers Bugarin and Echiberi signed the form as witnesses.

**Defendant's Confession**

After Defendant signed the "Advice of Rights" form, Officer Bugarin asked him if he wanted the interview to be recorded. Defendant declined.  Officer Echiberi proceeded to question him as Officer Bugarin took notes.  Defendant was very cooperative during the interview, and did not appear fatigued or sleepy.  The interview lasted between one and one-and-a-half hours.

Once Officer Echiberi completed his questioning, Officer Bugarin left the interview room and prepared a typewritten confession for Defendant. (Hearing Ex. 4).  Officer Bugarin returned with Officer Liana.  Officer Bugarin asked Defendant

Iwai to read the confession and initial next to each paragraph
that was correct.  At 7:52pm, Defendant Iwai initialed next to
each paragraph, and signed and dated the confession. (Hearing Ex.
4).  Defendant did not object to any part of the confession.  He
did not indicate that any part of the confession was incorrect.
Officer Bugarin testified that she did not pose as a lawyer, nor
did she provide legal advice to Defendant.

**Defendant Assisted the Officers' Investigation**

Officer Bugarin then asked Defendant to make a recorded
telephone call to the sender of the package.  Defendant agreed.
After the call, Officer Bugarin showed a still image of security
camera footage from a Las Vegas post office.  (Hearing Ex. 5).
Defendant Iwai identified a person in the picture as the sender
of the package.

## 1. Defendant Voluntarily Confessed

The totality of the circumstances regarding Defendant's
confession demonstrates that it was made voluntarily.  The
Supreme Court and the Ninth Circuit Court of Appeals have both
held that confessions made after advisement and waiver of Miranda
warnings are "generally [given] a virtual ticket of
admissibility."  Missouri v. Seibert, 542 U.S. 600, 608-09
(2004); DeWeaver v. Runnels, 556 F.3d 995, 1003 (9th Cir. 2009).
Defendant agreed to speak to Officers Echiberi and Bugarin after

receiving a <u>Miranda</u> warning at the ATF interview room.  Defendant
did not ask for an attorney.

The conditions in which Defendant confessed support a
conclusion that his confession was voluntary.  The interview at
the ATF Office lasted between one and one-and-a-half hours, well
within the accepted bounds of an interrogation's duration.
<u>United States v. Crawford</u>, 372 F.3d 1048, 1061 (9th Cir. 2004).
There is no evidence that the interview room was in poor
condition or otherwise unacceptable.  Defendant was provided with
water.  He was not handcuffed.  Officers Bugarin and Echiberi
were not visibly armed or wearing tactical gear in the room.

Defendant's mental and physical states were ordinary.
Defendant was very cooperative during his interview with Officers
Bugarin and Echiberi.  He did not appear fatigued or sleepy.
Testimony introduced at the suppression hearings indicated that
Defendant never displayed any signs of drug or alcohol
intoxication.  There is no evidence that Defendant was subjected
to undue coercion or inducement, so as to cause his will to
become overborne.  <u>Harrison</u>, 34 F.3d at 890.

### a. Defendant's Perception of Officer Bugarin

Defendant argues that his confession is invalid, as he
signed it under the impression that Officer Bugarin was acting as
his attorney.  No evidence was presented to support Defendant's

34

argument.

Defendant Iwai first came into contact with Officer Bugarin during the controlled delivery operation.  Officer Bugarin joined the entry team in Defendant Iwai's apartment and was one of the officers who arrested Defendant.  Throughout their entire interaction in the apartment, Officer Bugarin was visibly armed and wore tactical gear that had police markings on it.  She was the only female law enforcement officer involved with the operation.  Officer Bugarin identified herself as a police officer by showing her credentials to Defendant.  She explained to Defendant the contents of a consent-to-search form for his apartment.  She also apprised Defendant of his Miranda rights, to which he responded by asking for a lawyer.

After arresting Defendant, Officer Bugarin drove him to the ATF Office in a police car.  Defendant was handcuffed throughout the entire journey.  In response to the statements Defendant initiated in the car, Officer Bugarin specifically told him that they could talk about the case when they arrive at the ATF Office, and that she would inform him of his rights again.

In the interview room, Officer Bugarin informed Defendant Iwai of his Miranda rights for a second time, reminding him that the "Advice of Rights" form she presented contained the same content as in his apartment.  She sat across from Defendant while Officer Echiberi interviewed him.  Officer Bugarin took notes of

Defendant's statements and drafted a typed confession.  She
thoroughly reviewed each part of the confession with Defendant
Iwai to ensure it was accurate.

The facts regarding Defendant's interactions with Officer
Bugarin overwhelmingly establishes that no reasonable person
would mistake Officer Bugarin as his attorney.  Officer Bugarin
did not attempt to deceive Defendant into believing she was an
attorney.


The evidence presented establishes that Defendant's
confession was voluntary.

## III. DEFENDANT CONSENTED TO A SEARCH OF HIS CELLULAR TELEPHONE

The Fourth Amendment generally requires the government to
obtain a warrant or consent before searching the contents of a
cellular telephone.  See Riley v. California, 134 S. Ct. 2473,
2493 (2014).  If consent is provided, the scope of a search "is
limited by the extent of the consent given for the search by the
individual." United States v. Lopez-Cruz, 730 F.3d 803, 810 (9th
Cir. 2013).

The government bears the burden of proving by a
preponderance of the evidence that the consent was voluntary.
Carbajal, 956 F.2d at 930.  Determining the voluntariness of a
consent requires an examination of the totality of circumstances.

Kaplan, 895 F.2d at 622.   No single criterion is dispositive.
Id.

As previously stated, The Ninth Circuit Court of Appeals has
identified five factors that indicate whether an individual
voluntarily consented to a search:

(1) Whether the defendant was in custody;

(2) Whether the arresting officers had their guns drawn or
    otherwise overmastered the suspect;

(3) Whether Miranda warnings were given prior to the search;

(4) Whether the defendant was told he had a right to
    withhold his consent; and

(5) Whether the officers claimed that they could obtain a
    search warrant.

Patayan Soriano, 361 F.3d at 502.

**Defendant's Consent to Search his Cellular Telephone**

Shortly after he arrived at the ATF Office interview room,
but before he was questioned by Officers Bugarin and Echiberi,
Defendant was asked by Agent Jones and Officer Correa to consent
to a search of his cellular telephone.   Officer Correa provided a
consent form and explained its contents to Defendant Iwai.
Defendant indicated that he understood the form, and signed it.
(Hearing Ex. 3).

**A. Analysis of the Five Factors**

37

A review of the five factors supports a finding that Defendant voluntarily consented to a search of his cellular telephone.  Officer Bugarin had administered a <u>Miranda</u> warning to him upon his arrest at the apartment.  At the time he signed the consent form at the ATF Office, Defendant Iwai was in custody. Agent Jones and Officer Correa were not visibly armed.  They did not threaten or force him to sign the form.

**B.  Other Evidence Supports a Finding of Voluntariness**

In addition to the five factors, other evidence presented demonstrates that Defendant consented voluntarily. Officer Correa provided a consent form to Defendant and explained it to him. Defendant Iwai indicated that he understood the form and signed it.  (Hearing Ex. 3).  The fact that Defendant signed a consent form favors a finding of voluntary consent.  <u>Castillo</u>, 866 F.2d at 1082.  Defendant did not have trouble communicating with Officer Correa, nor did he appear intoxicated or fatigued.

Defendant voluntarily consented to a search of his cellular telephone.

<u>**CONCLUSION**</u>

(1) The law enforcement officers' warrantless entry into Defendant's apartment was lawful.

(2) The officers' seizure of the objects in plain view, a

38

handgun, substances resembling methamphetamine, and drug paraphernalia, was lawful.

(3) Defendant's consent to search his apartment was voluntary.

(4) Defendant waived his right to counsel by initiating conversation about his conduct during his transit to the ATF Office.

(5) Defendant voluntarily confessed.

(6) Defendant consented voluntarily to a search of his cellular telephone.

Defendant Bryant Kazuyoshi Iwai's Motion to Suppress Evidence and Statements (ECF No. 24) is **DENIED**.

IT IS SO ORDERED.

DATED:    Honolulu, Hawaii, May 13, 2016.



_____
Helen Gillmor
United States District Judge